POWDER COMPANY v. POWDER WORKS.

1. Reissued letters-patent must be for the same invention as that which formed the subject of the original letters; or for a part thereof when divisional reissues are granted. They must not contain any thing substantially new or different.

2. Original letters for a process will not support reissued letters for a composition, unless it is the result of the process, and the invention of the one involves the invention of the other.

3. Letters granted for certain processes of exploding nitro-glycerine will not support reissued letters for a composition of nitro-glycerine and gunpowder or other substances, even though the original application claimed the invention of the process and the compound. They are distinct inventions.

4. The last clause of sect. 53 of the act of July 8, 1870 (16 Stat. 205; Rev. Stat., sect. 4916), relates merely to the evidence to which the commissioner of patents may resort, but does not increase his power as to the invention for which a reissue may be granted. Whether said clause relates to any other than letters granted for machines is a question not considered in this case.

5. Reissued letters-patent No. 4818, for a new and useful improvement in compounds containing nitro-glycerine, and reissued letters-patent No. 4819, for a new and useful improvement in nitro-glycerine compounds, granted March 19, 1872, to the United States Blasting Oil Company, assignee of Alfred Nobel, are for a different invention from that described or suggested in original letters-patent No. 50,617, granted to said Nobel Oct. 24, 1865, for a new and useful improved substitute for gunpowder, upon which they are founded, and which they are intended, in part, to supersede. They are therefore void.

6. When there is a demurrer to the whole bill, and also to part, and the latter only is sustained, the proper decree is to dismiss so much of the bill as seeks relief in reference to the matters adjudged to be bad, overrule the demurrer to the residue, and direct the defendant to answer thereto.

APPEAL from the Circuit Court of the United States for the District of California.

This is an appeal from a decree dismissing, upon demurrer, a bill filed by the Giant Powder Company against the California Powder Works and others, charging them with the infringement of three certain letters-patent belonging to the complainant, and praying for an injunction and a decree for damages. These letters, for certain alleged inventions of one Alfred Nobel, of Hamburg, in Germany, relating to the use of nitro-glycerine in the manufacture of dynamite and other explosive compounds, are all reissues; two of them bearing date the nineteenth day of March, 1872, and numbered re-

spectively 4818 and 4819; and the third bearing date the seventeenth day of March, 1874, and numbered 5799. No. 4818 is for the mixture of gunpowder with nitro-glycerine; No. 4819 is for the mixture of rocket powder with nitro-glycerine; and No. 5799 is for a mixture of nitro-glycerine with porous or absorbent substances, forming what is called dynamite, or giant powder. The bill sets out the substance of the original and intermediate letters as well as those sued on, and of some of them makes *profert*. A consent order was made in the cause, that the complainant should file, as parts of the bill, copies of the several letters mentioned and described therein, of which *profert* was so made. The bill also sets forth by way of schedule a copy of the original application of Nobel filed in the Patent Office on the sixteenth day of September, 1865.

From the statements of the bill, and the documents thus annexed to and made part thereof, it appears that Alfred Nobel, on the day last aforesaid, by his attorney, filed in the Patent Office a paper describing certain alleged discoveries and inventions made by him in reference to the use of nitro-glycerine as an explosive agent and as a component in explosive compounds. Having in this document referred to the well-known property of nitro-glycerine, and the nitrates of ethyl and methyl, nitro-mannite, &c., whereby they cannot be exploded in open space by the application of fire, he proceeds to point out how he succeeds in effecting their explosion. He says : —

" A chief point of my invention consists in overcoming this difficulty. According as nitro-glycerine is to be used for fire-arms or for blasting, I adopt two different methods for promoting its explosion, viz.: —

" *1st Method.* By mixing it with gunpowder, gun-cotton, or any other substance developing a rapid heat, nitro-glycerine being an oil, fills the pores of gunpowder, and is heated by the latter to the degree of its explosion. Gunpowder treated in this way can take up from ten to fifty per cent of nitro-glycerine, and develops a greater power with a lesser quickness of explosion. Where the only object in view is to reduce the quickness of explosion of gunpowder, I mix it with or make it absorb common non-explosive oil from one to ten per cent of its weight.

"*2d Method.* When nitro-glycerine is to be used for blasting, where quickness of explosion is of great importance, I submit it to the most rapid source of heat known ; viz., that developed by pressure. To effect this, I make use of the pressure developed by heating a minute portion of nitro-glycerine, or by the detonation of any other violently exploding substance. Nitro-glycerine being a liquid, if it cannot escape, as for instance in a bore, receives and propagates the initial pressure through its whole mass, and is by that pressure instantaneously heated ; hence the first impulse of explosion decomposes the rest. There are many means of obtaining this impulse of explosion, such as —

" 1. When nitro-glycerine in tubes is surrounded by gunpowder, or *vice versa.*

" 2. By the spark or heat developed by a strong electric current when the nitro-glycerine is enclosed on all sides, so as not to afford an escape to the gas developed.

" 3. By a capsule," &c., six different methods of producing explosion of nitro-glycerine being pointed out, accompanied by drawings for showing the manner in which they were employed.

He then claims as his invention : —

1. The use of gunpowder or similar substances, when mixed with nitro-glycerine or analogous substances.

2. The reduction of the quickness of explosion of gunpowder by mixing it with oily explosive, or non-explosive substances.

3. The effecting the detonation of nitro-glycerine or analogous substances (which can be ignited without exploding) by the heat developed by pressure, promoting an impulse of explosion which decomposes the rest.

4. The exclusive use of nitro-glycerine and the class of substances described above, or mixtures of such as far as their application may be classed under any of the methods indicated in this memorandum.

He then describes a new method of preparing or manufacturing nitro-glycerine, and claims to be the inventor of that.

The bill further states, that after filing the above application Nobel's agent (one Howson) filed certain amendments thereto, striking out a portion of the original ; and on the twenty-fourth day of October, 1865, upon such amended application,

letters-patent were granted to Nobel for the term of seventeen years, numbered 50,617 ; and *profert* is made of the same in the bill, and they are set out in the record.

By reference to the specification of these letters, which are accompanied with drawings, they appear to be for a process, to wit, the process of using nitro-glycerine, or its equivalent, as a substitute for gunpowder, by exploding it in the manner pointed out. Having explained the nature of nitro-glycerine, nitrate of ethyl, methyl, and nitro-mannite, as in the original paper, the specification then points out how nitro-glycerine may be exploded after being confined in a hole drilled in the rock when to be used for blasting, or in a case when to be used for other purposes. Four distinct modes of doing this are enumerated : *first*, by exploding gunpowder in contact with the liquid ; *secondly*, by passing an electric spark through a fine wire immersed in it ; *thirdly*, by inserting in it a thin case containing lime-water ; and, *fourthly*, by a fuse. The drawings show the manner in which the wire is arranged for passing an electric spark through the fluid.

The bill then states that on the 13th of April, 1869, the above patent was surrendered, and four new divisional patents were issued for the same inventions for which the original patent was granted, numbered respectively reissues 3377, 3378, 3379, 3380 ; the first, No. 3377, being for the method of exploding nitro-glycerine by detonation ; the second, No. 3378, being for the application and use of percussion caps and other exploders to create the detonation necessary to explode the nitro-glycerine ; the third, No. 3379, being for the improved mode of manufacturing nitro-glycerine ; and the fourth, No. 3380, being (as stated in the bill) for the new explosive compounds invented by Nobel, viz. the mixture of gunpowder and nitro-glycerine, and the mixture of gun-cotton and nitro-glycerine, and the mixture of rocket powder and nitro-glycerine.

These four reissued patents are not referred to by way of *profert* in the bill ; but the above description of their purport is sufficient for the purpose of understanding their character.

The bill then states that on the nineteenth day of March, 1872, the said reissue 3380 was surrendered, and two new divisional patents for the same inventions were issued in lieu

thereof, numbered respectively reissues 4818 and 4819; the former being for the mixture of gunpowder with nitro-glycerine, and the latter for the mixture of rocket powder with nitro-glycerine; and each patent securing to the patentee the exclusive right of making, using, and vending the explosive compound therein described respectively. These are two of the patents on which the suit is brought; and *profert* is made of them in the bill, and they are set out in the record. By reference thereto, it appears that in reissue 4818 the patentee claims, —

1. The utilization, as explosives, of nitro-glycerine and the analogous liquid substances before mentioned (nitrate of ethyl, &c.), by combining therewith gunpowder, gun-cotton, or other similar substances developing a rapid heat or combustion, substantially as described.

2. The combination of gunpowder with nitro-glycerine, substantially as and for the purposes described.

3. The combination of gun-cotton with nitro-glycerine, substantially, &c.

In reissue 4819 the claim is for the mixture of nitro-glycerine and rocket powder.

The remainder of the bill is taken up in setting forth the other patent sued on, and various assignments by which the complainant deduces its title to the patents, with the allegation of infringement and prayer for relief.

To this bill the defendant demurred, as well to the whole bill for want of equity as to the relief sought in respect of the different patents taken separately; also for multifariousness, misjoinder of defendants, &c.

The demurrer having been sustained and a final decree entered dismissing the bill, the Giant Powder Company brought the case here.

*Mr. M. A. Wheaton* and *Mr. William Bakewell* for the appellant.

The vital question in this case is, Did the commissioner, when granting the reissues, have the right to look into Nobel's original specification on file, for the purpose of ascertaining what those inventions were, or was he confined to the amended specification which was issued with the letters-patent?

The Circuit Court decided that he could only look to the

amended specification.   For this reason they decided reissues Nos. 4818 and 4819 to be void, and sustained the demurrer.

If, therefore, he had a right to look at the original specification, the decree must be reversed.

Both upon authority and reason, he had the right, and was bound in duty, to look as well to the original as to the amended specification.

Although most of the adjudications on this point were made under the act of 1836, they are equally applicable to that of 1870.   The former did not say what should be used as evidence to prove the original invention on an application for a reissue.

As a matter of law and also of fact, the original specification, drawings, and model are never issued with the patent.   They remain on file; copies only are issued.

There are many cases in which the term *"original* specification" is used, instead of naming that which issues with the patent.   The correct rule is laid down in the case of *Collar Company* v. *Van Dusen* (23 Wall. 557, 558), in the following language : "Repeated decisions also have established the rule that parol testimony is not admissible in an application for a reissued patent, so as to enlarge the scope and effect of the invention beyond what was described, suggested, or substantially indicated in the original specification, drawings, or Patent-Office model, as the purpose of a surrender and reissue is not to introduce new features, ingredients, or devices, but to render effectual the actual invention for which the original patent should have been granted.

This is the whole point in this case; and it seems too plain for argument that *Seymour* v. *Osborne* (11 Wall. 516) holds that the original specification may be examined as claimed by us.

Sect. 5 of the act of 1837, and sect. 53 of the act of 1870, permitted several patents to issue for "distinct and separate parts of the thing patented."

The words "thing patented" here used doubtless refer to the thing patented by the reissues.

Nobel's whole inventions were made in utilizing nitro-glycerine.   One of them was the method of exploding it by mixing it with well-known explosives which explode by the application of fire.   One distinct and separate part of it was mixing

nitro-glycerine with gunpowder, another with gun-cotton, another with rocket powder, and so on. Every divisional patent issued for each one of these mixtures was valid, and reissue No. 4819 was, of course, one of them.

The law allowed divisional reissues. Sect. 5, act of March 3, 1837; act of 1870, sect. 53; *Goodyear* v. *Providence Rubber Co.*, 2 Fish. 499; s. c. 9 Wall. 788; *Goodyear* v. *Wait*, 3 Fish. 242; *Pennsylvania Salt Co.* v. *Thomas*, 5 id. 148; *Bennett* v. *Fowler*, 8 Wall. 445.

The act of 1870, sect. 53, re-enacted by sect. 4916 of the Revised Statutes, expressly provides for the introduction of new matter into the reissue of letters-patent for a process. When it was passed, there were well known, and had long been known, two classes of patents, — one with models and drawings, and the other without. The last part of the section refers to the class which includes those for processes, and not to the former class ; that is, patents for machines.

As new matter was proper to be introduced into the two reissues Nos. 4818 and 4819, the court below erred in sustaining the demurrer.

The grant of the reissue is *prima facie* evidence that the commissioner did his duty, and that the reissues were granted on proof satisfactory to him that whatever new matter was introduced into them was a part of the original invention, omitted by inadvertence, accident, or mistake from the specification attached to the original patent.

In the present case, the matter omitted from the original patent, and which forms the subject-matter of reissue No. 4818, is found in the original specification on the records of the office. Furthermore, neither model nor drawing of any thing embraced in that reissue was filed, for the reason that the invention is not, in that way, susceptible of illustration, being not a machine, but a combination of nitro-glycerine with gunpowder, gun-cotton, or similar substances.

The court below having sustained the demurrer so far only as reissues Nos. 4818 and 4819 are concerned, it erred in dismissing the whole bill. 1 Daniell, Ch. Pr., p. 543, sect. 1, p. 589, sect. 3, p. 598, sect. 5; *Livingston* v. *Story*, 9 Pet. 632.

The point on which the court below held reissues Nos. 4818

and 4819 to be invalid was that these reissues were not for the same invention as the original patent.

This is a question which should not have been decided without affording the parties an opportunity to offer evidence for the consideration of the court. *Seymour* v. *Osborne, supra; Battin* v. *Taggart*, 17 How. 74–85.

It is distinctly alleged in the bill that Nobel was the original and first inventor of the subject-matter of the several patents in suit; that the patents were duly granted; that the surrenders and reissues were duly made; that the reissues were for the same inventions; that the title was in the complainant; and that the defendants had infringed each of said patents. These facts being admitted by the demurrer are sufficient to establish the complainant's equity, and to entitle it to a decree. Welford, Eq. Pl., pp. 261–265; *Kay* v. *Marshall*, 2 Webs. P. C. 39; 1 Myl. & Cr. 373; *Westhead* v. *Keene*, 1 Beav. 287.

If any of these facts are denied by the demurrer, it is no longer a demurrer, but a plea by demurrer, which is bad, and therefore should have been overruled.

*Mr. George Harding, contra.*

MR. JUSTICE BRADLEY, after stating the facts, delivered the opinion of the court.

The main defence relied on by the counsel of the defence, on the demurrer, is, that it is apparent that the reissued patents numbered 4818 and 4819 are not for the same invention as that which was described in the original letters-patent numbered 50,617, for a portion of which they purport to be reissues.

It is apparent, they say, that the original patent was for a process, to wit, a mode, or different modes, of exploding nitroglycerine; whereas the reissues are for manufactured compounds or mixtures, namely, mixtures of nitro-glycerine with gunpowder, gun-cotton, and rocket powder. It is contended that a process and a mixture are the subjects of different inventions; that a patent granted for one cannot, by its surrender, be the basis of a reissued patent for the other. If this position is sound, and the matter can be examined on demurrer, it was not error to dismiss the bill as to all relief sought in reference to the two reissues in question.

We have no doubt that the question may be examined on demurrer; for the bill sets forth in full both the original patent and the reissues, so that they may be examined and compared together. If it were a case in which the identity or non-identity of the inventions in the original and reissued patents was a complicated question, the court might require the defendants to answer, in order to have the benefit of evidence on the subject. But in ordinary cases, the court itself will compare them. Whether a patent is for a process or a composition is especially a question of construction, and is for the court to decide; and whether a patent for a process is the same invention as a patent for a composition is certainly a mere question of law. We feel no hesitation, therefore, in approaching the consideration of the questions presented by the pleadings.

Upon due examination of the patents in question, it cannot well be doubted that the original patent, No. 50,617, granted on the 24th of October, 1865, was for a process, or rather for different processes and appliances for producing the explosion of nitro-glycerine; nor can it be doubted that the reissued patents, Nos. 4818 and 4819, granted in 1872, are for compounds and mixtures; in other words, for compositions of matter. In the specification of the original patent, the inventor says: " My invention consists in the use as a substitute for gunpowder of nitro-glycerine, or its equivalent, substantially in the manner described hereafter, so that the said liquid, which, when exposed, cannot be wholly decomposed and exploded, shall by confinement be subjected to heat and pressure, by which its total and immediate decomposition and explosion is effected." He then proceeds: " In order to enable others to make and use my invention, I will now proceed to describe the method of carrying it into effect. On reference to the accompanying drawing which forms a part of this specification, Fig. 1 is a view, partly in section, of one apparatus by means of which I render nitro-glycerine, or its equivalent, available as a substitute for gunpowder; and Fig. 2 is a plan view. There is a class of explosive substances comprising nitro-glycerine, the nitrates of ethyl and methyl, and nitro-mannite, which have long been known, but have never been practically applied as explosive

agents." He then describes the behavior of these substances, when, being in an unconfined state, they are subjected to appliances of flame and contusion, no explosion being thereby produced; and then shows how, when they are in a confined state, their complete explosion may be produced by the processes which he describes; adding, " The chief point of my invention consists in overcoming the difficulty of suddenly igniting the entire mass of the materials mentioned, so that the same can be practically used as explosive agents." He then shows how nitro-glycerine may be best prepared and manufactured for the purposes of use as an explosive agent. Then he describes the four several methods or appliances for producing the explosion desired, which have already been referred to, concluding with this formal claim: " I claim as my invention, and desire to secure by letters-patent, the use of nitro-glycerine, or its equivalent, substantially in the manner.and for the purposes described." The only equivalents of nitro-glycerine referred to or pointed at in the specification are the cognate substances of nitrate of ethyl and methyl and nitro-mannite. It is to be presumed that these are referred to. when the patentee uses the expression, " nitro-glycerine or its equivalent."

Now, in all this specification there is not a hint of any new mixture or new composition of matter having been invented by the patentee. The only thing that approaches it is the method which he describes, of preparing the pure nitro-glycerine. The whole invention set forth, described, and claimed consists of methods or processes of exploding the substance so as to render it a useful exploding agent. The technical form of the claim, it is true, is in appearance a little broader, being for the use (generally) of nitro-glycerine as an exploding agent; but these general terms are properly limited by those which follow, namely, " substantially in the manner and for the purposes described." If any other method of exploding nitro-glycerine should be discovered different from the processes invented and described by the patentee, it could be employed without infringing his patent. According to our view, therefore, the patent is for those processes and methods as applied to the use · of nitro-glycerine, or its equivalent, as an explosive agent.

Inasmuch as the reissued patents in question, numbered 4818 and 4819, are for compounds of nitro-glycerine with various other substances, it is impossible not to say that they are for an entirely different invention from that secured, or attempted to be secured, by the original patent.

If the patent had been not for the mode or process of exploding nitro-glycerine, but for the process of compounding nitro-glycerine with gunpowder and other substances, inadvertently omitting to claim the exclusive use of the substances so produced, the case would have been one of very different consideration. That was the case with Goodyear's patent, which was issued in 1844, and claimed only the process of vulcanizing india-rubber. In 1849 it was surrendered, and two new patents issued in lieu thereof, — one for the process, and the other for the composition. In 1852, the validity of these reissues came up for consideration in the third circuit, in the case of *Goodyear* v. *Day*, which was argued by Mr. Choate, Mr. Webster, and other eminent counsel. Mr. Justice Grier disposed of the objections as follows: "We now come to the objections which have been made to the reissued or amended patents of 1849. The first objection is that the patents of 1844 and 1849 are not for the same invention. This objection is not founded in fact. Both patents are for precisely the same invention or discovery. They both describe, in nearly the same words, the best mode of manufacturing india-rubber, by exposing it to a high degree of heat in connection with sulphur and white lead; by which treatment the substance is endowed with new and valuable qualities which it did not possess before. The discovery is the same; the mode of manufacturing the compound is the same. The first patent had set forth the nature and extent of the invention defectively. There is no reason to doubt the *bona fides* and propriety of the reissue. It is apparent on the face of the papers, even if the action of the commissioner on that point was not conclusive." Again, he adds: "The fourth objection is 'that the latter patent claims more than was contained in the original.' If the latter patent is for precisely the same invention, art, or discovery as that described in the first, the objection that it claims more is a mistake of fact. If the last patent differs from the first only in stating more clearly

and definitely the real principles of the invention, so that those who wish to pirate it may not be allowed to escape with impunity through the imperfection of the language used in the first, there has arisen one of the cases for which it was the intention of the act of Congress to provide, and the objection is worthless in point of law." This case is partially reported in 2 Wall. Jr. 283, but the opinion of Mr. Justice Grier is not stated in full. In another case, arising on the original patent of Goodyear, reported in 2 Wall. Jr. 356, Mr. Justice Grier used this expression: " The product and the process constitute one discovery." The product in Goodyear's invention was the direct result of the process. They were parts of one invention, and, except in imagination, could no more be separated from each other than the two sides of a sheet of paper, or than a shadow from the body that produces it.

The present case is entirely different. The processes which the patentee described as his invention in the original patent, No. 50,617, had no connection with the compounds or mixtures which are patented in the reissued patents. They were not processes for making those compounds, and in describing them the compounds were not mentioned. The invention of the one did not involve the invention of the other. The two inventions might have been made by different persons, and at different times.

We think, therefore, that the conclusion is irresistible, that the two reissued patents, numbered 4818 and 4819, are for a different invention from that described or suggested in the original patent No. 50,617, upon which they are founded, and which they are intended, in part, to supersede.

These reissues being granted in 1872, were subject to the law as it then stood, being the act of July 8, 1870, the fifty-third section of which (reproduced in sect. 4916 of the Revised Statutes) relates to the matter in question. It seems to us impossible to read this section carefully without coming to the conclusion that a reissue can only be granted for the same invention which formed the subject of the original patent of which it is a reissue. The express words of the act are, " a new patent for the same invention ; " and these words are copied from the act of 1836, which in this respect was substantially

the same as the act of 1870. The specification may be amended so as to make it more clear and distinct; the claim may be modified so as to make it more conformable to the exact rights of the patentee; but the invention must be the same. So particular is the law on this subject, that it is declared that "no new matter shall be introduced into the specification." This prohibition is general, relating to all patents; and by "new matter" we suppose to be meant new substantive matter, such as would have the effect of changing the invention, or of introducing what might be the subject of another application for a patent. The danger to be provided against was the temptation to amend a patent so as to cover improvements which might have come into use, or might have been invented by others, after its issue. The legislature was willing to concede to the patentee the right to amend his specification so as fully to describe and claim the very invention attempted to be secured by his original patent, and which was not fully secured thereby, in consequence of inadvertence, accident, or mistake; but was not willing to give him the right to patch up his patent by the addition of other inventions, which, though they might be his, had not been applied for by him, or, if applied for, had been abandoned or waived. For such inventions, he is required to make a new application, subject to such rights as the public and other inventors may have acquired in the mean time. This, we think, is what the present statute means, and what, indeed, was the law before its enactment under the previous act of 1836. If decisions can be found which present it in any different aspect, we cannot admit them to be correct expositions of the law.

The counsel for the complainant refers us to, and places special reliance on, the last clause of sect. 53 of the act of 1870, where it is said: "But where there is neither model nor drawing, amendments may be made upon proof satisfactory to the commissioner that such new matter or amendment was a part of the original invention, and was omitted from the specification by inadvertence, accident, or mistake." But this clause relates only to the evidence which may be employed by the commissioner in ascertaining the defects of the specification. It does not authorize him to grant a reissue for a different

invention, or to determine that one invention is the same as another and different one; or that two inventions essentially distinct constitute but one.    In this case, it is not necessary for us to decide, and we express no opinion as to the precise meaning and extent of the final clause of sect. 53, to which we have referred ; as, whether it relates to all patents, or only to patents for machines.    But as it relates to the matter of evidence alone, it cannot enlarge the power of the commissioner in reference to the invention for which a reissue may be granted. That power is restricted, by the general terms of the section, to the same invention which was originally patented.    Conceding that the commissioner had a right, in this case, by virtue of the clause in question, to examine the original application of Nobel, as it stood before it was amended, in order to ascertain what his invention really was, it would only show that he described, in that paper, two different inventions, — one for a composition, and another for a process distinct from the composition.    It would not prove that the two inventions were the same; and it would not authorize the commissioner, on a reissue, to add the one to the other, as a part thereof.

The complainant insists, however, that the present reissues are for the same invention which was patented in the reissued patent, No. 3380, granted in April, 1869; and that the latter reissue was granted before the passage of the act of 1870.    But this fact does not help the complainant.    The law relating to reissues was substantially the same under the act of 1836 as it is under the act of 1870.    As before remarked, the former act as well as the latter restricted the power of the commissioner, in granting reissues, to " the same invention " which was the subject of the original patent.    It has been repeatedly so held by this court, as the following cases will show: *Burr* v. *Duryee*, 1 Wall. 531; *Seymour* v. *Osborne*, 11 id. 516; *Gill* v. *Wells*, 22 id. 1; *The Wood Paper Patent*, 23 id. 566.

Since, therefore, the reissues in question are not for the same invention for which the original patent was granted, it follows that they are void ; and the bill must be dismissed so far as relates to the said reissued patents numbered respectively 4818 and 4819.

As nothing is shown, however, in the statements of the bill, which affects the validity of the third patent sued on, the bill should not have been dismissed as a whole, but only as to the said reissues 4818 and 4819. For this error the decree must be reversed, and the cause remanded with directions to enter a decree in conformity with this opinion, dismissing the bill as to all relief sought therein in respect of, or in reference to or founded upon, the said reissued patents numbered respectively 4818 and 4819, and, as to the residue of the bill, overruling the demurrer and directing the defendants to answer in accordance with the rules and practice of the court.

*So ordered.*