FLOWER and another *v.* RAYNER.*

(*Circuit Court, D. New Jersey.* ———, 1881.)

1. RE-ISSUE—WHAT NECESSARY TO AUTHORIZE—REV. ST. § 4916.

To authorize a re-issue the original patent must be inoperative or invalid, either from defective or insufficient specifications, or from claiming as new more than the patentee had a right to claim, and the error sought to be corrected must have arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention; and where the original shows upon its face that the grounds for a re-issue do not exist, or where a comparison of the letters disclose different inventions, the re-issue is void. The specifications may be made more definite, or the claim modified to make it more conformable to the right of the patentee, but the invention must be the same.

*Powder Co.* v. *Powder Works*, 98 U. S. 138.

2. SURRENDER OF PATENT—JUDGMENT OF COMMISSIONER NOT CONCLUSIVE UPON COURTS.

The action of the commissioner of patents in accepting a surrender and granting a re-issue of letters patent is judicial in its character, and presumed correct, but is not conclusive upon the court; but they may always compare the original and re-issue to see whether they disclose a case in which the commissioner has jurisdiction to grant a re-issue.

*Giant Powder Co.* v. *California Co.* 18 O. G. 1340; S. C. 4 FED. REP. 720.

3. IMPROVEMENT IN PRESERVE CANS — RE-ISSUE—VARIANCE BETWEEN RE-ISSUE AND ORIGINAL LETTERS.

An original patent for improvement in preserve cans, etc., (No. 43,463) manufactured of tin, contained a single claim, and that for producing indelible lettering designs, etc., upon sheet tin or tinned sheet iron by a combination of lithographic or plate printing, and the action of heat upon the surface of the tin and upon metallic colors printed on such surface; the process as described being for print-

*Reported by Homer C. Eller, Esq., of the St. Paul bar.

ing the design with metallic colors on plates of tin or sheet iron before being made into cans, and then exposing them in a properly-constructed furnace to the gradual action of temperature sufficiently high to slightly amalgamate the colors printed with the surface of the tin. In the re-issued patent (No. 7,556) the application of colors was not confined to plates of sheet tin or tinned sheet iron, but included cans, boxes, and manufactured articles; nor were the colors confined to metallic or mineral colors, and the process for heating seemed to abandon the idea of amalgamating the colors with the surface of the metal, directions being given for drying the colors. *Held*, that the re-issue was unauthorized and void.

*Frederick H. Betts* and *Nash & Holt*, for complainants.

*Rowland Cox*, for defendant.

NIXON, D. J. This a suit for an alleged infringement of the re-issued letters patent No. 7,556, dated March 13, 1877, for "improvement in decorating tin plates, cans," etc. The original letters patent were granted to Julien Roussel, Laurent Delangre, and Lucien Robin, assignors of the complainants, numbered 43,463, and dated July 6, 1864, for a new and useful improvement in preserve cans and other articles manufactured of tin, and which had been previously patented in France on the thirtieth of September, 1863. Various defences have been set up in the answer, but the strength of the argument on the hearing seems to have centered in the one, that the re-issue is for a different invention from that described in the original patent.

The right of the owner of a patent to surrender the same and take out a re-issue, and the limitations upon the right, are found in section 4916 of the Revised Statutes. It is provided in this section that "whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the surrender of such patent, * * * cause a new patent for the same invention, and in accordance with the corrected specification, to be issued to the patentee * * * for the unexpired part of the term of the original patent. Such surrender shall take effect upon the issue of the amended

patent. * * * But no new matter shall be introduced into the specification, nor, in case of a machine patent, shall the model or drawings be amended except each by the other. But, when there is neither model nor drawing, amendments may be made upon proof satisfactory to the commissioner that such new matter or amendment was a part of the original invention, and was omitted from the specifications by inadvertence, accident, or mistake, as aforesaid."

A careful reading of the section shows that the commissioner has power to grant a re-issue only in special cases and under particular circumstances. The original patent must be inoperative or invalid, either for defective or insufficient specifications, or from claiming as new more than the patentee has the right to claim; and, in addition to this, the error which is sought to be corrected must have arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention. If the party interested can bring himself within these conditions and limitations, the commissioner is authorized to issue a new patent for the same invention. When the original shows upon its face that the grounds and reasons for the re-issue do not exist, or where a comparison of the letters patent disclose different inventions, the re-issue is void, as an act unauthorized by the law.

What, then, was the error or defect in the original patent which justifies the surrender and re-issue in the present case?

On an examination of the letters we find a single claim, as follows: "A process for the production of indelible lettering, designs, and colored surfaces upon sheet tin or tinned sheet iron, by a combination of lithographic or plate printing, and the action of heat upon the surface of tin and upon the metallic colors printed on such surface of tin." Turning from the claim to the specifications, it will be perceived that the patentees have used the same phraseology in describing the nature of their invention. It is stated to be a process to produce indelible lettering, designs, etc., upon sheet tin by a combination of printing, and the action of heat upon the surface of tin, and upon the metallic colors printed on the tin. They then describe how it is to be accomplished. "We

prepare," say the patentees, "a lithographic stone in the usual way by lithographic printing. The stone is to be of a suitable size to correspond to a plate of sheet tin, large enough to cut a certain number of slips of sheet tin from, for the manufacture of an equal number of cans. Metallic paint, of any desired color, is then applied to the surface of the stone, by means of a lithographic roller, in the usual manner, so as to cover the whole surface of the stone with color. The plate of sheet iron is then placed upon the colored surface of the stone, in the same manner as a sheet of paper is placed on the stone in the usual process of lithographic printing, and the stone, with the plate thereon, is then run through the lithographic press; after which the color will be imprinted upon the surface of the sheet tin. Another stone of the same size having been prepared by lithographic printing, and the lettering or designs, which are to appear on the surface of the cans in the place of the labels, having been lithographed on the stone in the usual manner, metallic paint (of a color different from that with which the sheet tin has been covered) is put on the stone by a lithographic roller so as to adhere to the lithographed lettering or designs, in the same manner as if an impression had been made on paper. The plate of sheet tin, covered with a coat of color as above described, is then placed upon the stone, (the colored surface in contact with the lithographed face of the stone,) and the stone, with the plate thereon, is then run through the lithographic press; after which the lettering or designs will appear imprinted upon the colored surface of the sheet tin. If it is desired to have only the lettering or design which shall serve the object of a label, and no coat of color, on the surface of the cans, the process of printing just described is, of course, dispensed with, and the second process of printing only applied to. After a number of plates of sheet tin have been thus printed, they are placed in a properly-constructed furnace-chamber, where they are exposed to the gradual action of à temperature sufficiently high to slightly amalgamate the colors printed on the sheet-tin plates with the surface of the latter. Any person can easily ascertain the proper degree of temperature required by

instituting a few experiments, during which the plates are to be very slowly heated, and from time to time to be inspected until the amalgamation required takes place."

There seems to be no difficulty or uncertainty in regard to the foregoing description of how the process was to be carried on, or of understanding the nature of the invention which was in the minds of the patentees. Their aim was to produce an indelible impression upon the surface of sheet tin, and this was done by transferring metallic paint from the surface of a stone prepared in the usual way for lithographic printing to the surface of the tin, and then fastening it there by the slow application of artificial heat. Paints with a metallic base were used, upon the theory that some sort of a fusion or amalgamation took place between the metallic base of the color and the metallic surface of the tin. The specifications of the original patent distinctly state, as the crowning result of the cooling of the plates after the application of the process, "that the lettering, designs, or coat of color will be strongly united with the surface of the plates, and, in fact, with the body of them, so as to be indelible."

Thus construing the original patent, is the re-issue for the same invention? Without quoting largely its claims and specifications, it may be said generally: (1) That in the re-issue the application of colors and letters, by means of a press, is not confined to sheet tin or tinned sheet iron, as in the original, but includes the application to cans, boxes, or other metallic articles. The claims state that the process is to be employed in lettering, decorating, and ornamenting sheet tin, and, in addition thereto, articles manufactured from tin, as well. (2) That whilst in the original metallic colors— that is, colors having metals for a base—only are spoken of to be used in the process, a preference seems to be given in the re-issue to mineral colors. The word "metallic," as qualifying colors, is dropped, and any kind of color may be taken, whether the base be a mineral, a metal, or a vegetable or animal substance. Full directions for mixing and drying the paint are also added, although no suggestion for the use of dryers has been made in the original. (3) That the sugges-

tion in the re-issue of 160 deg. Fahrenheit as the proper degree of temperature generally required to cause the printing to adhere tenaciously to the surface of the tin, would seem to show that all idea of amalgamating the color with the tin, as distinctly indicated in the original, was abandoned. Nothing like amalgamation can take place by the application of any such low degree of heat.

There are other differences, but I think the foregoing are sufficient to bring the case within the principle of adjudged cases in which the re-issue has been declared void.

Acting upon the caution thrown out by Mr. Justice Bradley, speaking for the whole court, in *Railway Co.* v. *Sayles*, 97 U. S. 563, the courts are more and more inclined "to regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use."

After considering the provisions of the original patent, and every suggestion therein made in regard to the nature and scope of the invention, it is difficult to find a sufficient or satisfactory ground for a surrender and re-issue. There was no want of harmony between the claim and the specifications. The one corresponded with the other. The patentee clearly revealed what he proposed to do, to-wit, to indelibly print sheet tin by amalgamating metallic colors with the surface of the tin, and the process by which it was to be accomplished. If he found, in actual practice, that the process would not produce the desired result, or that he could have a better result by bringing in other instrumentalities, the office was open to him for a new patent, but not for a re-issue of the original, incorporating therein any new or different ingredients.

That the changes made must be regarded as new and unauthorized, appears from the decision of the court in the case of *Russell* v. *Dodge*, 93 U. S. 460. The original patent there was for a process of treating bark-tanned lamb or sheep-

skin by means of a compound in which heated fat liquor was an essential ingredient. In the re-issue a change was made by eliminating the necessity of using the fat liquor in a heated state, and making its use in that condition a mere matter of convenience, and by inserting a claim for the use of fat liquor in the treatment of leather generally.

The court said that such a change enlarged the scope of the patent, and that there was no doubt of the invalidity of the re-issue. "The change made in the old specification by eliminating the necessity of using the fat liquor in a heated condition, and making in the new specification its use in that condition a mere matter of convenience, and the insertion of an independent claim, for the use of fat liquor in the treatment of leather generally, operated to enlarge the character and scope of the invention. The evident object of the patentee in seeking a re-issue was not to correct any defects in specification or claim, but to change both, and thus obtain, in fact, a patent for a different invention."

What is authorized to be done in cases of re-issue is declared by the supreme court in *Powder Co.* v. *Powder Works,* 98 U. S. 138, where it is said: "The specification may be amended so as to make it more clear and distinct. The claim may be modified so as to make it more conformable to the exact rights of the patentee; but the invention must be the same. So particular is the law upon this subject, that it is declared that 'no new matter shall be introduced into the specification.' This prohibition is general, relating to all patents, and by *new matter* we suppose to be meant new substantive matter, such as would have the effect of changing the invention or of introducing what might be subject of another application for a patent."

It was insisted on the argument that, as the power to accept a surrender and issue new letters patent is vested exclusively in the commissioner, his decision is not open to collateral attack in a suit for infringement of the re-issue. His action in the matter is doubtless of a judicial character, and is presumed to be correct until impeached in a regular way; and yet the court is not obliged to accept his

decision as final. This question has been recently examined
by Mr. Justice Field, sitting in the circuit court, in the case
of *The Giant Powder Co.* v. *The California Co.* 18 O. G. 1340,*
in which he holds that the examination of the original and
re-issued patents by the court is always allowable, "to see
whether or not they disclose on their face a case in which the
commissioner has authority to act, or whether he has ex-
ceeded his authority ·in issuing letters for an invention dif-
ferent from that described in the original patent. If they
disclose a case in which the commissioner has no jurisdic-
tion to act, or a case in which, by his determination, he
has exceeded his jurisdiction, the re-issued letters must.fall."

Taking this view of the re-issue, I have not thought it nec-
essary to protract the opinion by formally examining the
other grounds of defence so ably presented by the counsel for
the defendants, viz.: that the re-issued patent is void (1) for
want of novelty, and (2) for want of utility. It may be said,
however, in regard to the first, that if no result is in fact
reached, by the application of the paint by means of a press,
different from that produced by the use of the bob and sten-
cil in japanning, it is questionable whether such a change of
method involves anything more than the exercise of skill and
good judgment. More was claimed in the original patent,
to-wit, an indelible union by amalgamation of metallic colors
with the surface of the tin. But this seems to have been treated
in the re-issue as a matter of no consequence. What, then,
is left for the invention but the substitution of old equivalent
means for the production of possibly better, but not differ-
ent, results? See *Stimpson* v. *Woodman*, 10 Wall. 117; *Smith*
v. *Nichols*, 21 Wall. 112.

In regard to the lack of utility, if the process is to become
practically useful, I think there must be, in its actual use, a
wide departure from the methods and means specified in the
re-issue. The evidence shows that 160 deg. Fahrenheit is as
much too low in temperature, as an hour and a half is too
short in time, to sufficiently harden the coloring. Courts are,
indeed, liberal in construing descriptions in patents, where

*S. C. 4 FED. REP. 720.

particular degrees of heat are to be employed; but some approximation ought to be indicated by the patentee, and it should not be so wide of the mark as to involve invention or frequent experiment to ascertain the proper temperature.

The complainant's bill must be dismissed, with costs.